## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY JENKINS, | ) | |
| | ) | CASE NO. 4:14CV1110 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Kimberly Jenkins ("Jenkins") challenges the final decision of the Acting Commissioner of Social Security, Carolyn Colvin ("Commissioner"), denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

### I.  Procedural History

On September 1, 2010, Jenkins filed an application for SSI alleging a disability onset date of July 29, 2010 and claiming she was disabled due to a herniated disc in her lower back, chronic obstructive pulmonary disease ("COPD"), and asthma.  (Tr. 46, 221, 236-237.)  Her application was denied both initially and upon reconsideration.  (Tr. 158-160, 165-167.)  Jenkins timely requested an administrative hearing.

On March 4, 2013, an Administrative Law Judge ("ALJ") held a hearing during which Jenkins, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 64-108.)  On March 20, 2013, the ALJ found Jenkins was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 46-58.)  The ALJ's decision

became final when the Appeals Council denied further review.[1]  (Tr. 1-7.)

## II.  Evidence

### *Personal and Vocational Evidence*

Age forty-four (44) at the time of her administrative hearing, Jenkins is a "younger" person under social security regulations.  *See* 20 C.F.R. § 416.963(c).  (Tr. 56, 72.)  Jenkins has an 11th grade education and past relevant work as an extrusion press operator and child monitor. (Tr.  56, 74, 100.)

### *Relevant Medical Evidence*[2]

Jenkins has a history of chronic lower back pain.  In March 2008, Jenkins underwent an MRI of her lumbar spine, which showed (1) mild generalized disc bulging at L4-5 with borderline impingement upon bilateral intrathecal L5 nerve roots; and, (2) a suspected 4 mm central disc herniation at L5-S1 with mild bilateral facet arthropathy without overt neural foraminal narrowing.  (Tr. 463.)  An MRI of Jenkins' cervical spine showed minimal bulging at C5-7, but was otherwise unremarkable.  (Tr. 464.)

On April 15, 2010, Jenkins presented to the emergency room ("ER") with complaints of back pain after apparently being involved in motor vehicle accident the week before.[3]  (Tr. 306-307.)  She also reported night terrors, nightmares, and "having thoughts of hurting others."  (Tr. 307.)  Jenkins denied having any psychiatric treatment; however, the ER treatment note lists her current medications as Zoloft, Cymbalta, and Divalproex.  *Id*.  Jenkins was discharged in stable

---

[1]  As discussed in more detail *infra*, Jenkins filed a previous application for SSI on February 26, 2008 alleging a disability onset date of January 1, 1997.  That claim was denied initially on July 9, 2008 and upon reconsideration on November 13, 2008.  A hearing was conducted before an ALJ on July 15, 2010.  On July 28, 2010, the ALJ issued a decision denying Jenkins' application.  (Tr. 46, 113-24.)

[2] Because it is not relevant to the issues presented in Jenkins' Brief, the medical evidence regarding her asthma and restrictive/obstructive airway disease will not be recounted herein.

[3]  The ER treatment note references an automobile accident (Tr. 307) but also states that: "It is unclear when the presenting problem started. History comes from patient. . . . Somewhat disjointed history. . . Pt very vague re details.  Source is a poor historian." (Tr. 306.)

condition with primary diagnoses of depressive disorder; bipolar disorder; and, chronic back pain.  (Tr. 306.)

On April 30, 2010, Jenkins presented to Anita Hackstedde, M.D., for treatment of her asthma and chronic back pain.  (Tr. 313.)  Dr. Hackstedde's treatment notes indicate that Jenkins "has had some problems with illicit drug use in the past, I do not think she is an appropriate candidate for us to prescribe any narcotics whatsoever."  *Id.*  Jenkins returned to Dr. Hackstedde in June 2010, at which time she was referred for pain management.  (Tr. 312.)

On June 25, 2010, Jenkins presented to psychiatrist K.R. Kaza, M.D., for "follow-up medication management and supportive therapy" relating to her complaints of nightmares, flashbacks, depression, anxiety and "low energy."  (Tr. 349.)  Jenkins denied hallucinations and suicidal feelings.  *Id.*  It is unclear from the medical record what medications she was taking at this time, but it appears she had been prescribed Valium for her anxiety.  (Tr. 312.)

In August 2010, Jenkins presented to David Cola, D.O., for treatment of her "long history of chronic back pain with herniated discs."  (Tr. 310.)  She reported "difficulty walking, pain down her legs, [and being] numb from the knees down."  *Id.*  Dr. Cola's treatment note indicates Jenkins "walks with a cane."  *Id.*  On examination, Dr. Cola noted negative straight leg raise bilaterally; and, "full range of motion of the lumbosacral spine with pain at the extremes of range of motion, pushing on her thigh to get up."  *Id.*  Dr. Cola also noted that "the patient stated she had to walk with a cane, but when she left the room, she walked down the hall without any difficulty or limp."  *Id.*  Nevertheless, Dr. Cola gave Jenkins a prescription for a cane and referred her to pain management.  *Id.*

Jenkins continued to see Dr. Kaza on a regular basis for treatment of her mental conditions.  In October 2010, she complained of mood swings and depression, and was continued on her treatment plan of "pharmacotherapy/psychotherapy."  (Tr. 347.)  In December 2010, Jenkins complained of nightmares and flashbacks; was continued on her medications; and, was given support and insight therapy.  (Tr. 345.)

On January 5, 2011, Jenkins was evaluated by consultative psychological examiner Vernon Brown, Ph.D.  (Tr. 318-326.)  She reported a history of head trauma as a result of a

3

motor vehicle accident in April 2009, and "episodes of domestic violence." (Tr. 320.) She complained of night sweats, night terrors, crying spells, "feeling sad all the time," panic attacks, and visual and auditory hallucinations. (Tr. 320-322.) Dr. Brown described Jenkins' attitude as "evasive" and her mood as "mildly dysphoric." (Tr. 321.) He summarized his conclusions as follows:

> The clinical interview found her to be mildly dysphoric with appropriate affect. Ms. Jenkins appeared to be of low average intelligence. Her ability to concentrate was grossly intact. Her immediate recall and recent and remote memory functions all appeared moderately impaired. She reported both visual and auditory hallucinations. Her reported psychotic symptoms seemed inconsistent with her presentation. Her description of auditory hallucinations seemed exaggerated. Her memory deficits appeared selective and profound. Ms. Jenkins at first denied any history of substance abuse problems then acknowledged prior substance abuse treatment. She reported that she continues to abuse cannabis once a month. The referral material raises the possibility of drug seeking behavior. She said at the beginning of this interview that she needed pain medication.

> The DSM-IV-TR specifies a procedure for calculating a Global Assessment of Functioning (GAF) score where the score is determined after considering the person's symptoms and functioning and assigning the lower rating of the two. In terms of symptoms, Ms. Jenkins is at 40 based on her report of visual and auditory hallucinations. In terms of functioning, she is at a 60 based on having some meaningful interpersonal relationships. While she no longer has friends, she has her boyfriend and her mother. The lower of the two yields a rating of 40.

(Tr. 324-325.)[4]  Based on the above, Dr. Brown diagnosed Jenkins with personality disorder NOS and cannabis abuse. (Tr. 325.) He assessed that she was (1) not impaired in her ability to understand, remember, and follow instructions; (2) not impaired in her ability to maintain attention and concentration to perform simple repetitive tasks; (3) moderately impaired in her

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Association, 4th ed revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0 - 100, with lower numbers indicating more severe mental impairments. A GAF score between 0 - 50 indicates serious symptoms or any serious impairment in social, occupational or social functioning. DSM-IV at 34. A GAF score between 51 - 60 denotes "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." DSM-IV at 34. It bears noting that a recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Association, 5th ed., 2013).

ability to relate to others, including fellow workers and supervisors; and, (4) moderately impaired in her ability to withstand the stresses and pressures associated with day-to-day work activity. (Tr. 326.)

On January 29, 2011, state agency physician Jerry McCloud, M.D., reviewed Jenkins' medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 139-140, 143.)  Dr. McCloud concluded Jenkins was capable of lifting and/or carrying 50 pounds occasionally and 25 pounds frequently; standing and/or walking for about 6 hours in an 8 hour workday; and, sitting for about 6 hours in an 8 hour workday.  (Tr. 139.)  He further found she had unlimited push/pull capacity and no postural, manipulative, or environmental limitations.[5]  *Id.*

The next day, state agency psychologist Steven J. Meyer, Ph.D., reviewed Jenkins' records and completed a Mental RFC Assessment.  (Tr. 140-142.)  Dr. Meyer opined Jenkins had no understanding or memory limitations, but that she was moderately limited in her abilities to carry out detailed instructions; maintain attention and concentration for extended periods; and, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 140.)  In addition, Dr. Meyer found Jenkins was moderately limited in her abilities to interact appropriately with the general public and to respond appropriately to changes in the work setting.  (Tr. 141.)  In sum, Dr. Meyer concluded Jenkins was "capable of simple and moderately complex routine work, in setting with regular expectations, occasional intermittent interactions with others and few changes."  *Id.*

On February 7, 2011, Jenkins presented to Kristen Hymes, D.O.  (Tr. 353-354.)  At this

---

[5]  On March 31, 2011, state agency physician Bradley Lewis, M.D., reviewed Jenkins' records and completed a Physical RFC Assessment. (Tr. 152-153.)  Therein, Dr. Lewis affirmed Dr. McCloud's assessment in all respects, except Dr. Lewis added that Jenkins should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation. (Tr. 153.)

visit, Jenkins complained of chronic low back pain and indicated that a "Dr. Munda"[6] had installed a pain pump and prescribed a back brace. (Tr. 353.) She denied any numbness, tingling or weakness in her lower extremities, and denied any bladder incontinence. *Id.* Dr. Hymes' examination revealed tenderness to palpation of the lumbosacral region; good range of motion, flexion and extension; and, negative straight leg raise. *Id.* Dr. Hymes advised Jenkins to lose weight and referred her to pain management. (Tr. 354.)

Later that month, on February 11, 2011, Jenkins returned to Dr. Kaza for treatment of her anxiety and depression. (Tr. 343.) She indicated Valium wasn't helping and she was "just tight as a knot." *Id.* She reported feeling increased anxiety and depression, as well as constant back pain. *Id.* It appears she requested, and was prescribed, Xanax. *Id.*

On March 8, 2011, Jenkins presented to the ER complaining of back pain. (Tr. 336-340.) She reported a gradual onset of symptoms resulting in difficulty walking. (Tr. 337-338.) The ER doctor noted Jenkins "can walk without assistance but with some difficulty." (Tr. 338.) Examination revealed bony tenderness over L2-S1; a moderately abnormal Patrick's test bilaterally; moderately abnormal straight leg raise test bilaterally; and, moderate stiffness with decreased range of motion of the lumbar spine. *Id.* Jenkins was prescribed Decadron and discharged in stable condition.[7] (Tr. 337, 340.)

On April 21, 2011, Jenkins reported to the ER for treatment of a dog bite after a "friend sicked a pit bull dog" on her. (Tr. 342, 351, 365-366.) She had 27 sutures placed on her face, and was prescribed antibiotics. (Tr. 351, 365-372.) She presented to Dr. Kaza the next day for follow-up treatment. (Tr. 342.) Dr. Kaza's treatment note indicates Jenkins was "on Vicodin" and "unsteady on her feet." *Id.* He described her mood as "very very low" and noted "terrible self isol[ation] at home." *Id.* At this visit, Jenkins reported "hearing voices." *Id.* She stated she

---

[6] The parties do not direct this Court's attention to any treatment notes from a "Dr. Munda."

[7] On April 4, 2011, state agency psychologist Karla Voyten, Ph.D., reviewed Jenkins' medical records and completed a Mental RFC Assessment. (Tr. 153-155.) Therein, Dr. Voyten affirmed Dr. Meyer's January 2011 Mental RFC Assessment in every respect. *Id.*

was out of Valium and Xanax and requested additional medication.  *Id.*

Jenkins presented to Dr. Cola on May 2, 2011 for removal of the sutures.  (Tr. 351-352.) She requested narcotics but Dr. Cola refused to prescribe them.  *Id.*  Later that day, Jenkins presented to the ER seeking narcotic pain medication.  (Tr. 360-361.)  According to the ER treatment notes, Jenkins "left after she was told narcotics were not indicated for her condition." (Tr. 360.)

On June 16, 2011, Jenkins presented to Dr. Cola for evaluation of an elevated heart rate. (Tr. 420-421.)  She reported chronic back pain and indicated she used a cane.  (Tr. 420.)  Dr. Cola referred Jenkins to a cardiologist; ordered blood work; and, advised her to continue her pain medication.  (Tr. 421.)  Jenkins returned to Dr. Cola in October 2011 with complaints of continued back pain.  (Tr. 419.)  She reported that physical therapy had not worked, but stated she had been walking and exercising more.  *Id.*  Dr. Cola noted full range of motion in Jenkins' lumbosacral spine and a negative straight leg raise bilaterally.  *Id.*  He referred her for "ortho/pain management." *Id.*

Jenkins thereafter began treatment with chiropractor William F. Grubbs, D.C. in October 2011.  (Tr. 388.)  During her initial visit, Jenkins presented with a cane, and generally reported feeling "miserable all the time" as a result of her neck and back pain.  *Id.*  Although difficult to decipher, Dr. Grubbs' examination appeared to reveal increased cervical, thoracic, and lumbar pain, tenderness, limited range of motion, and joint fixation.  *Id.*

In November 2011, Jenkins reported to her gynecologist Fu Nen Lee, M.D., that she continued to have leaking urinary incontinence, particularly when lifting and bending. (Tr. 394.) Jenkins was referred to urologist Christopher A. Stiff, M.D., who examined her in January 2012. (Tr. 399.)  Dr. Stiff noted that Jenkins complained of night time incontinence, urgency, and leaking with coughing and sneezing.  (Tr. 399.)  He ordered a urodynamic study, which revealed some rotation of her bladder neck and bladder instability, but no signs of obstruction or malignancy.  (Tr. 401-405.)  Dr. Stiff believed Jenkins' largest problem was urge incontinence, and prescribed Vesicare.  (Tr. 405.)  In a subsequent visit with Dr. Lee, Jenkins continued to report "uncontrolled leaking of urine in the form of urge incontinence and urinary stress

7

incontinence."  (Tr. 500.)  Dr. Lee renewed Jenkins' Vesicare prescription. *Id.*

Meanwhile, in February 2012, Dr. Grubbs completed a Medical Source Statement regarding Jenkins' physical capacity.  (Tr. 461-462.)  Therein, Dr. Grubbs offered that Jenkins could lift and/or carry a maximum of 20 pounds occasionally and 5 pounds frequently; and that her  abilities to stand, walk, and sit were not affected by her impairment.  (Tr. 461.)  Dr. Grubbs further found Jenkins could (1) frequently balance, stoop, and crouch; (2) frequently reach, handle, feel, and engage in fine and gross manipulation; (3) occasionally climb, kneel, and crawl; and, (4) occasionally push/pull.  (Tr. 461-462.)  Dr. Grubbs opined Jenkins was restricted from heights, moving machinery, temperature extremes, chemicals, dust, noise and fumes.  (Tr. 462.)  He concluded she needed an at-will sit/stand option and, further, that she would need rest periods in addition to a morning break, lunch, and afternoon break.  *Id.*  Finally, he noted Jenkins had been prescribed a brace and tens unit, but not a cane. *Id.*

Jenkins returned to Dr. Grubbs in April, May, June, July, September, and December 2012.  (Tr. 413, 425-427, 466-467.)  During these visits, Dr. Grubbs generally noted cervical, thoracic, and lumbar pain and tenderness, fixation, and often (although not always) decreased range of motion.  *Id.*  Her condition appears to have remained principally unchanged throughout this time period.  *Id.*

Meanwhile, on April 6, 2012, Dr. Kaza completed a Medical Source Statement regarding Jenkins' mental capacity.[8]  (Tr. 410-411.)  Therein, Dr. Kaza rated Jenkins as "poor" in all categories, with the sole exception that her ability to maintain appearance was rated as "fair."[9]

---

[8]  There appears to have been a year-long gap in Jenkins' mental health treatment.  Based on this Court's review, the last mental health treatment note in Jenkins' medical record is dated April 4, 2011, over a year prior to Dr. Kaza's completion of the Medical Source Statement discussed above.  (Tr. 342.)  Indeed, neither party directs this Court's attention to any mental health treatment records between April 2011 and April 2012.  The Court notes Jenkins testified during her hearing that there was a gap in her psychiatric treatment while she was incarcerated. (Tr. 81-82.)

[9]  The form completed by Dr. Kaza defines the terms "poor or none" as follows: "No useful ability to function in a competitive setting.  May be able to perform in a sheltered setting." (Tr. 410.)  The term "fair" is defined as: "Ability to function in this area is seriously limited but not

Among the categories in which he rated Jenkins as "poor" were her abilities to: follow work rules; use judgment; maintain concentration and attention for extended periods of 2 hour segments; respond appropriately to changes in routine setting; maintain regular attendance and be punctual; deal with the public; relate to co-workers; interact with supervisors; function independently without special supervision; work in coordination with or proximity to others without being unduly distracted or distracting; perform at a consistent pace without an unreasonable number and length of rest periods; and, understand, remember, and carry out complex, detailed and simple job instructions.  (Tr. 410-411.)  Dr. Kaza rated Jenkins' abilities to socialize, behave in an emotionally stable manner, relate predictably in social situations, manage funds/schedules, and leave her home on her own, as "poor or none."  (Tr. 411.)

In May 2012, Jenkins reported to Dr. Kaza for follow up medication management and supportive therapy.  (Tr. 454-455.)  She denied delusions and hallucinations, and reported that her nightmares were under "good control."  (Tr. 455.)  Dr. Kaza placed Jenkins on Zoloft for depression; Valium for nightmares; and, Xanax for anxiety.  *Id.*  On June 1, 2012, Jenkins returned to Dr. Kaza and reported she had stopped taking Zoloft because "it didn't work for me." (Tr. 453.)  He changed her medication to Effexor.  *Id.*  Jenkins returned to Dr. Kaza later that month, at which time she was crying and anxious because someone "stole [her] meds" and "Social Security took my son's money and only gave me $400 for him." (Tr. 452.)  Dr. Kaza continued Jenkins on her meds and encouraged her to maintain a stable mood, eat healthy foods, exercise regularly, and follow-up with a medical doctor.  *Id.*

On June 10, 2012, Jenkins presented to the ER with complaints of dizziness, abdominal pain and back pain.  (Tr. 475-482.)  She complained of generalized lower abdominal pain; lower back pain; chronic fatigue; and, general weakness.  (Tr. 476.)  Jenkins was described in treatment notes as "thrashing in the bed, hyperventilating, crying." (Tr. 478.)  A CT scan was performed of her abdomen/pelvis, which showed that her liver, spleen, adrenal glands, kidneys, pancreas, appendix, and bladder were all unremarkable.  (Tr. 488.)  The scan did reveal follicular

---

precluded. May need special consideration and attention." *Id.*

changes to Jenkins' left ovary and a small amount of nonspecific free fluid in her pelvis. *Id.* Jenkins was diagnosed with chronic pain; intervertebral disc prolapse; vomiting symptom; abdominal colic; and, leukocytosis. (Tr. 482.) The ER doctor administered Ativan and Demerol; prescribed four tablets of Percocet; and, discharged Jenkins in an improved condition. (Tr. 478-479.)

Jenkins began treatment with Thomas Ranieri, M.D., in June 2012. (Tr. 428-429.) At her first visit, she complained of neck, lower back, and right leg pain, which she described as constant, aching, stabbing, and throbbing. (Tr. 428.) On examination, Dr. Ranieri noted decreased range of motion; pain on flexion, extension, rotation and side bend; positive straight leg testing; positive Patrick's test for back pain; positive heel and toe walk; 1+ reflexes in the upper extremities, patella, and ankles; tandem gait; tenderness over the spinous process; and, paraspinal muscle spasm. *Id.* He ordered x-rays and an MRI of Jenkins' lumbar spine; a total skeletal bone scan; and, an EMG of both legs. (Tr. 429.)

The x-rays and bone scan were conducted on June 22, 2012 and reported as normal. (Tr. 473, 474.) Jenkins underwent the MRI on July 5, 2012. (Tr. 470-471.) It revealed the following: (1) at L5-S1, moderate generalized disc bulging, impinging upon bilateral S1 intrathecal nerve roots, as well as mild bilateral facet arthropathy and borderline neural foraminal narrowing; and, (2) at L4-L5, mild generalized disc bulging with borderline impingement upon bilateral L5 intrathecal nerve roots, as well as mild facet arthropathy and ligamentum flavum hypertrophy creating minimal bilateral neural foraminal narrowing. (Tr. 471.)

Jenkins returned to Dr. Ranieri on July 16, 2012, at which time he again observed decreased range of motion; pain on flexion, extension, rotation and side bends; positive straight leg raising; positive Patrick's test for back pain; positive heel and toe walk; tandem gait; paraspinal muscle spasm; and, decreased mobility. (Tr. 431-432.) He diagnosed lumbosacral radiculopathy and lumbar degenerative disc disease; and, ordered lumbar facet blocks. (Tr. 432.)

On July 27, 2012, Jenkins underwent an Adult Diagnostic Assessment and Mental Status Exam with Steven Ilko, L.P.C.C. (Tr. 438-450.) At this time, Jenkins reported a history of physical and sexual abuse; and, past and present substance abuse. (Tr. 438, 439, 442, 443.) She

10

complained of increased depression, anxiety, post-traumatic stress, and anger.  (Tr. 443, 444.)
Jenkins indicated her current medications included Valium, Xanax, and Trazadone.  (Tr. 441.)
She was diagnosed with Post-Traumatic Stress Disorder ("PTSD") and cannabis abuse; and,
assessed a GAF of 47.  (Tr. 447.)  Jenkins agreed to undergo counseling and continue with her
medications.  (Tr. 447.)

The following month, Dr. Kaza completed an Initial Psychiatric Evaluation of Jenkins.
(Tr. 434-437.)  Jenkins reported she was "angry all the time" and wanted "to hurt somebody all
the time." (Tr. 434.)  She indicated her night terrors had stopped, and her panic attacks had
decreased.  *Id.*  Dr. Kaza described Jenkins' demeanor as hostile, mistrustful, and preoccupied.
(Tr. 435.)  He stated she had a flat affect, and described her mood as depressed, angry, and
irritable. (Tr. 436.)  Dr. Kaza diagnosed PTSD; assigned a GAF of 50; and, continued Jenkins on
Valium, Xanax, and Trazadone.  (Tr. 436-437.)

On September 7, 2012, Dr. Kaza completed another Medical Source Statement regarding
Jenkins' mental capacity.  (Tr. 459-460.)  Once again, he rated Jenkins "poor" in nearly every
listed category.  The only exceptions were that Jenkins was rated "fair" in terms of her abilities
to maintain appearance; leave home on her own; and, understand, remember, and carry out
complex job instructions.[10]  *Id*.  When asked to provide medical/clinical findings that supported
his assessment, Dr. Kaza wrote: "Client gave [history of] sexual abuse, [illegible], anxiety,
depression– nightmares [illegible] flashbacks."  (Tr. 460.)

Meanwhile, Jenkins returned to Dr. Ranieri in August, September, and October 2012, and
January 2013.  (Tr. 503-510.)  Throughout this time period, Jenkins continued to complain of
neck, lower back, and right leg pain, which she variously rated between a 7 and 10 on a scale of
10.  *Id*.  Dr. Ranieri generally found decreased range of motion; pain on flexion, extension,
rotation and side bends; positive straight leg raising; positive Patrick's test for back pain;

---

[10] It is curious that Dr. Kaza rated Jenkins' ability to understand, remember and carry out
complex job instructions as "fair," since on the very same form he indicated her abilities to
understand, remember, and carry out simple and detailed job instructions was "poor."  (Tr.
460.)

positive heel and toe walk; and, tandem gait.  (Tr. 503, 505, 507.)  On January 29, 2013, Dr. Ranieri noted Jenkins had an "antalgic gait [and] dec[reased] sensation in fingers and toes and hyperalgesia and hyperpathi in CS and LS area, + occipital tenderness."  (Tr. 509.)  On that date, he ordered spinal mapping in the lumbar and cervical spine areas and steroid injections in Jenkins' right knee.  (Tr. 510.)  Dr. Ranieri's treatment notes indicate Jenkins' medications included Ultram, Vicodin, Voltaren, and Tramadol.  (Tr. 509-510.)

Finally, on February 1, 2013, Jenkins returned to Dr. Kaza, complaining that "[t]his bipoliar is killing me. . . I'm up and down!"  (Tr. 511.)  Dr. Kaza's treatment notes indicate Jenkins presented with a flat affect, and describe her "behavior/functioning" as angry, anxious, and irritable.  Id.  Jenkins again reported a decrease in her nightmares and panic attacks.  Id.  Dr. Kaza prescribed Lamictal to address her mood swings.  Id.

### Hearing Testimony

During the March 4, 2013 hearing, Jenkins testified to the following:

- She was in special education classes for math and English, and completed the 11th grade.  She can read and write.  She can only do simple math because of her dyslexia.  She cannot do multiplication.  She has not obtained her GED.  (Tr. 74-75.)

- She is not married.  She lives with her boyfriend and 17 year old son.  (Tr. 73.)

- She has not worked since her onset date of July 29, 2010.  In 1998, she worked as a press operator for three months. This was a full-time, temporary position. She was on her feet most of the day for this job.  In 2000, she worked as a baby sitter for her neighbor's two small children (ages 1 and 2).  She worked full time (five days a week, 8 hours per day) in this position for one year, and lifted approximately 25 pounds.  (Tr. 76-80.)

- She cannot work because of her back pain, "mental state," and incontinence.  (Tr. 80.)  She described her back pain as "achy, throbbing, and constant."  (Tr. 87.)  She rated it a six or seven on a scale of 10 on an average day.  She has increased pain when she "overdoes it," which occurs approximately twice per month.  Activities which can cause a flare-up include climbing steps, doing laundry, washing dishes, and cooking.  When she has a flare-up, she has to stay in bed for a week.  (Tr. 88.)

- She has had back injections for several years.  She tried physical therapy but it was too painful and seemed to "aggravate it even more."  She sees a chiropractor instead.  She was prescribed a cane in 2010, which she still uses.  She has been wearing a back brace for the past two months.  She also has been using a TENS unit.  She has not had any back surgeries.  (Tr. 83-84, 86-87, 90-91.)

- She cannot sit for too long because "everything goes numb on her."  Both her

arms and her legs tingle, and she needs to stand up.  If something is too heavy, she will drop it.  She can only hold her young grandson (who weighs 20 pounds) for about ten minutes before needing to sit down.  (Tr. 92-93.)

- She experiences urge incontinence on a daily basis.  Her doctor determined there was nothing wrong with her bladder.  Her incontinence appears to be stress-related.  She experiences both daytime and nighttime incontinence.  She wears protective undergarments.  (Tr. 85, 97-98.)

- She experiences violent outbursts and has been physically violent with an ex-husband and coworkers.  (Tr. 94-95.)  She has been fired from jobs for being "anti-social."  (Tr. 95.)  She sees a psychiatrist once per month and a social worker several times per month for her mental impairments.  (Tr. 82.)  She has seen her psychiatrist for several years, but there is a gap in treatment when she was incarcerated for one year.  (Tr. 81-82.)  She experiences visual hallucinations, where she sees someone walking past her out of the corner of her eye.  (Tr. 95.)

- Her psychiatrist has told her that her mental condition is "getting worse."  (Tr. 96.)  Both her memory and concentration are affected.  (Tr. 97-98.)  Her psychiatrist is trying different medications to treat her condition.  (Tr. 96.)  She is currently taking Xanax, Valium, and Trazadone.  (Tr. 83.)

- She does not have a driver's license because she is afraid she will get "another OVI" if she drives while taking her prescription medications.  (Tr. 73.)  Her son and boyfriend help with the grocery shopping.  She walks around the grocery store but "sits at will."  She also uses the "motorized buggies" at the store.  (Tr. 89-90.)

The VE testified Jenkins had past relevant work as an extrusion press operator (light, unskilled, SVP 2) and a child monitor (medium, semi-skilled, SVP 3).  (Tr. 100.)  The ALJ then posed the following hypothetical:

And I ask you to assume the same– an individual the same age, education and past work experience as the claimant, with the following abilities: said individual is capable of medium exertional level work, must avoid concentrated exposure to cold– to extreme cold– and irritants such as fumes, odors, dust and gases; and hazards such as dangerous moving machinery and unprotected heights.  Also, this individual can do no work that requires completion of more than unskilled tasks or one to two step instructions, can do no work that requires more than occasional contact with supervisors or coworkers, but no public contact, must work with things rather than people, and can do no work that requires completion of rapid production quotas, and would require the use of a cane.  Could an individual with these limitations perform the claimant's past work?

(Tr. 101.)  The VE testified such an individual could not perform Jenkins' past work and, further, would not be able to perform any other jobs at the medium level.  *Id.*

The ALJ then asked:

Okay, well would there be jobs at the light level? And let me add a few limitations on that, so I have the proper light level.  The limitations that were given, plus at the light level can never climb ladders, ropes or scaffolds; can

13

> occasionally climb ramps or stairs, balance, stoop, crouch; can never kneel and never crawl. Also, said individual must avoid concentrated exposure – in addition the extreme cold, must avoid concentrated exposure to extreme heat, excessive noise, excessive vibration, and I think I stated previously the concentrated exposure to irritants, and said individual must avoid all exposure to hazards such as dangerous moving machinery and unprotected heights. I assume, then, in addition to the limitations previously given that this individual would not be able to perform past work, is that correct?

(Tr. 102.) The VE testified such an individual could not perform Jenkins' past work, but could perform other jobs such as mail clerk (in a business setting, as opposed to the postal service) (light, unskilled, SVP 2); small products assembler (light, unskilled, SVP 2); and, sewing machine operator (light, unskilled, SVP 2). (Tr. 102-103.)

The ALJ then added to the following limitation to the above hypothetical: "said individual would require the opportunity to alternate between sitting and standing and/or walking one to two minutes every half hour without being off task." (Tr. 103.) The VE testified such an individual would be able to perform the previously identified jobs of mail clerk; small products assembler; and, sewing machine operator. *Id.*

The ALJ then asked whether there would be any jobs available at the sedentary exertional level. (Tr. 103.) The VE testified that there would, and identified the jobs of surveillance system monitor (sedentary, unskilled, SVP 2); document preparer (sedentary, unskilled, SVP 2); and, table worker (sedentary, unskilled, SVP 2). (Tr. 103-104.)

The ALJ then asked whether there would be any jobs if the hypothetical individual "were off task or to miss work 20 percent of [the] work week or greater." (Tr. 104.) The VE testified there would be no jobs available for such an individual.[11] *Id.*

Jenkins' attorney then noted that the ALJ's first hypothetical required the mandatory use of a cane, and inquired whether that limitation was present in the subsequent hypotheticals. (Tr. 105.) The ALJ replied that mandatory use of a cane was part of his later hypotheticals, and the

---

[11] At the conclusion of questioning by the ALJ, the VE stated that his testimony was consistent with the DOT and SCO "with the exception of there being the sit/stand option posed in the, I believe, third hypothetical." (Tr. 104.) He explained that this opinion regarding this limitation was "based on my having performed the job myself, or my having performed job analyses, or my having become familiar with how a job is performed otherwise." *Id.*

14

VE confirmed that as his understanding when testifying about available jobs.  *Id.*  Jenkins'

attorney then questioned the VE as follows:

> Q:    Now, doctor, with regard to the second hypothetical– that was at a light
>        RFC, with the other limitations laid out by the judge.  The mail clerk
>        position and the small products assembler and the sewing machine
>        operator– do those require the use of two hands in performing [those]
>        job[s]?
>
> * * *
>
> A:    Yes.
>
> Q:    Okay, so if the hypothetical— that hypothetical worker required the use
>        of a cane then how would she be able to perform those jobs if one hand,
>        you know, was being used to hold on to that cane?
>
> A:    Well, the sewing machine operator wouldn't need to use the cane while
>        sitting at a sewing machine.  The mail clerk – it wouldn't be how it's
>        typically performed, but the individual uses a cart to distribute the mail,
>        and would be able to assist him in mobility in going around the office, and
>        the small products assembler job is done primarily sitting down.
>
> Q:    So are those sedentary positions?
>
> A:    No.
>
> Q:    Those are still considered light?
>
> A:    By definition in The Dictionary of Occupational Titles, yes.
>
> Q:    Okay, would the numbers  — I know you offered numbers– but would
>        they be reduced at all if * * use of a cane was mandatory?
>
> A:    I don't believe so.
>
> Q:    In the mail clerk job, is part of the duties in that job to sort mail?
>
> A:    Yes.
>
> Q:    And is that generally done with two hands?
>
> A:    It's not necessarily required.
>
> Q:    But it can be done with two hands?
>
> A:    That's how it's typically done in a person who has no limitations in the
>        use of their hands.
>
> Q:    Same question in regard to the small products assembler.  It is typically
>        done with two hands?
>
> A:    Using the opposite hand as an assist primarily.

15

(Tr. 105-107.)  Finally, Jenkins' attorney asked: "If we were to assume a hypothetical worker the claimant's age, education, and work history who were to be absent from work two or more days per month on a regular basis, would be hypothetical worker be able to maintain employment?" (Tr. 107.)  The VE testified that "an individual can be absent up to two times a month and generally still be able to maintain employment, and if an individual were to exceed that limit on an ongoing basis eventually the person will lose their job." *Id.*

### III.  Standard for Disability

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201. The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

The ALJ found Jenkins established medically determinable, severe impairments, due to degenerative disc disease of the lumbar spine with radiculopathy; degenerative disc disease of the cervical spine; asthma; mild restrictive and obstructive airway disease; osteoarthritis of the right knee; urge incontinence; depressive disorder; anxiety disorder; and a history of cannabis abuse; however, her impairments, either singularly or in combination, did not meet or equal one

16

listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 48- 51.) Jenkins was found incapable of performing her past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 51-56.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Jenkins was not disabled. (Tr. 56-58.)

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

### *RFC Assessment/Drummond*

In her first assignment of error, Jenkins argues the ALJ failed to recognize "changed conditions involving Plaintiff's symptoms and inappropriately applied *res judicata* effect" pursuant to *Drummond v. Comm'r of Soc. Sec*., 126 F.3d 837 (6th Cir. 1997). (Doc. No. 17 at 14.) Specifically, Jenkins maintains the decision recognized that she suffered from a new severe impairment (i.e., urge incontinence) but failed to include any limitations arising from this impairment in the RFC. *Id*. at 17. Jenkins further claims the record contains "new diagnostic evidence demonstrating a worsening of [her] lumbar condition" but "the ALJ arbitrarily added a sit/stand option to her [RFC] finding without the support of any medical opinion evidence." *Id*. at 18. Finally, Jenkins argues that, in assessing her mental impairments, the ALJ failed to provide "good reasons" for rejecting the opinions of her treating psychiatrist K.R. Kaza, M.D. *Id*. at 20.

The Commissioner argues the ALJ "reasonably considered evidence related to Plaintiff's

18

physical and mental impairments since [the previous ALJ's] July 2010 decision." (Doc. No. 21 at 9.) With regard to Jenkins' urge incontinence, the Commissioner maintains the decision fully considered the medical evidence regarding this impairment and included related limitations in the RFC, including postural and stress-related limitations. The Commissioner also notes that "Plaintiff fails to point to evidence suggesting that further limitations were warranted." *Id*. at 14. With regard to Jenkins' increased back pain, the Commissioner argues the ALJ reasonably addressed this condition by adding a sit/stand option, noting the RFC is consistent with the opinion of Jenkins' chiropractor, Dr. Grubbs. *Id*. at 11. Finally, with regard to Jenkins' mental impairment, the Commissioner argues that "[t]he ALJ reasonably explained why the evidence failed to show [a] worsening [of this impairment] and why the [RFC] assessment accommodated the mental limitations evidenced by the medical record." *Id.* at 16.

In *Drummond*, the Sixth Circuit held that the Commissioner is bound by its prior findings with respect to a claimant's disability application unless new and material evidence, or changed circumstances, require a different finding. *Id*. at 842. The Social Security Administration ("SSA") later acquiesced in this ruling. *See* Acquiescence Ruling 98-4(6), 1998 WL 283902 (June 1, 1998) ("AR 98-4(6)"). In AR 98-4(6), the SSA stated that "[w]hen adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding." AR 98-4(6) at * 3.

Therefore, under *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*. *Slick v. Comm'r of Soc. Sec*., 2009 WL 136890 at * 4 (E.D. Mich. Jan. 16, 2009). In order to avoid the application of *Drummond*, a claimant must present evidence showing that her symptoms have changed since the time of the Commissioner's prior determination. *See Bender v. Comm'r of Soc. Sec*., 2012 WL 3913094 at * 5 (N.D. Ohio Aug. 17, 2012) (citing *Casey v. Sec'y of Health & Human Servs*., 987 F.2d 1230,

1232 (6th Cir. 1993)). Moreover, a claimant "must not merely present new and material evidence, but that evidence must show that [her] condition deteriorated from the state of her condition at the time the ALJ made the decision." *Drogowski v. Comm'r of Soc. Sec.*, 2011 WL 4502988 at * 8 (E.D. Mich. July 12, 2011). *See also Casey*, 987 F.2d at 1232-1233 (holding that where the Secretary already denied a claimant's application for one period, the claimant must then show that "her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity"). Thus, a prior ALJ's ruling that a claimant is capable of working is binding upon a subsequent ALJ unless the claimant can show that her symptoms have worsened since the time of the prior decision. *See Bender*, 2012 WL 3913094 at * 5; *Salsgiver v. Comm'r of Soc. Sec.*, 2012 WL 2344095 at * 12 (N.D. Ohio June 12, 2012).

Here, Jenkins filed her first application for SSI on February 26, 2008, alleging disability beginning January 1, 1997. (Tr. 113.) After her claim was denied both initially and upon reconsideration, a hearing was conducted before an ALJ on July 15, 2010. *Id.* In a written decision dated July 28, 2010, that ALJ denied Jenkins' application. (Tr. 113-124.) The ALJ thoroughly discussed the medical evidence regarding Jenkins' back and neck pain, breathing problems, endometriosis, and urge incontinence. (Tr. 115-119.) The decision also recounted the evidence regarding Jenkins' mental impairments, including her complaints of nervousness, anxiety, panic attacks, and nightmares. *Id.* Based on this evidence, the ALJ concluded, at step two, that Jenkins suffered from the severe impairments of lumbar and cervical degenerative joint disease; mild restrictive and obstructive airway disease; post-traumatic stress disorder; and, depressive disorder. (Tr. 115.)

After concluding that Jenkins' impairments did not meet or equal a listing, the decision assessed the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). In addition, the claimant has the following non-exertional limitations: she can do no work that requires the climbing of ladders, ropes, and scaffolds; she can do no work that requires more than occasional climbing of ramps or stairs, or balancing, stooping, kneeling, crouching, or crawling; she must avoid concentrated exposure to changes in temperatures of hot or cold; she must avoid concentrated areas of vibration, fumes, dusts, odors, gases, or other air pollutants; she must not work around environmental hazards such as dangerous,

20

> moving machinery or unprotected heights; she can do no work that requires completion or more than unskilled tasks, or one- to two-step instructions; she can do no work that requires more than occasional contact with supervisors or co-workers; but no public contact (working with things rather than people); and she can do no work that requires completion of rapid-production quotas; and she would require the use of a cane.

(Tr. 121.) In reaching this assessment, the ALJ determined Jenkins was "not entirely credible, particularly in regard to her allegations of pain, limitations, and overall disability" because the "objective medical evidence does not clearly support the extreme nature of her subjective complaints." *Id*. The decision noted that Jenkins' physicians had "uniformly suggested conservative treatment." *Id*. In addition, the ALJ explained that Jenkins had a history of non-compliance with her medication regimen; her description of her pain had been vague; and, "the objective medical evidence does not appear to support any physical need for" a cane. (Tr. 122.)

In discussing the opinion evidence, the previous ALJ accorded significant weight to the opinion of state agency consultative examining psychologist Dr. Degli, who determined Jenkins was moderately impaired in her abilities to interact with peers, supervisors, or the general public; to maintain concentration, persistence, and pace; and, to withstand the stress and pressures of the competitive workplace. (Tr. 122.) The decision discussed the opinion of Jenkins' psychiatrist, Dr. Kaza, as follows:

> The undersigned accords less weight to the opinions of Dr. Kaza, particularly at Exhibits 21F/2-3 and 27 F. Dr. Kaza opined that the claimant could not perform any kind of work. This opinion is dispositive to the issue *sub judice*, and is therefore reserved exclusively to the Commissioner. The undersigned therefore cannot accord the opinion any special significance or weight for the purposes of determining disability. Moreover, such extreme limitations are not supported by the weight of the other evidence of record, and exceeds even the claimant's descriptions of her activities. At Exhibits 18F/1-2 and 21F/2-3, Dr. Kaza opined that the claimant could not tolerate stress, both during her daily routine and in the workplace. Dr. Kaza did not cite the medical evidence that would support this opinion. Rather, the first portion of Dr. Kaza's statement at Exhibit 21F/2 is little more than a chronicle of the claimant's subjective statements. In a discussion of the claimant's clinical status abnormalities, Dr. Kaza noted that the claimant felt severely depressed and suicidal at times, that she had a flat affect, was concerned about her chronic pain, depression and financial problems, but that she was oriented to time, place and person. These findings do not fully support Dr. Kaza's later conclusions. Though he noted that the claimant['s] concentration was poor, he also noted that the claimant's physical pain, rather than her psychological symptoms, prevented her from performing her daily activities. For these reasons, the undersigned has accorded less weight to the opinions of Dr. Kaza at Exhibit 21F/2-3.

(Tr. 122-123.)  Finally, the ALJ concluded Jenkins was unable to perform her past relevant work but was able to perform other jobs in the national economy (such as hand packer, home companion, and hand washer) and, therefore, was not disabled.  (Tr. 123-124.)

Jenkins then filed the instant application for SSI on September 1, 2010, alleging disability beginning on July 29, 2010 (the day after the previous ALJ decision was issued).  (Tr. 46.)  In the written decision denying this application, the new ALJ discussed *Drummond* and AR 98-4(6) as follows:

> Social Security Acquiescence Ruling (AR) 98-4(6) addresses the decision made in *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997). This Ruling applies only to disability findings in cases involving claimants who reside in Kentucky, Michigan, Ohio, or Tennessee and states that when adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as a prior claim, adjudicators must adopt such a finding from the final decision by an Administrative Law Judge (ALJ) or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.
>
> **When considering the prior decision made by the Administrative Law Judge the undersigned has determined that the previous findings are adopted with the exception that the additional limitation of a sit/stand option is added to the residual functional capacity due to some progression in the claimant's degenerative disc disease**.

(Tr. 48) (emphasis added).

The decision then discussed the medical evidence not only regarding Jenkins' back and knee pain, but regarding her asthma and urge incontinence as well.  (Tr. 51-56.)  With regard to Jenkins' mental impairments, the ALJ found that "there is little change if any from the previous decision."  (Tr. 55.)  The decision recounted the medical evidence regarding Jenkins' mental health symptoms and treatment, and discussed the opinion evidence offered with regard to her mental limitations, including the opinions of consultative examiner Dr. Brown and treating psychiatrist Dr. Kaza.  (Tr. 52, 55-56.)  The ALJ accorded significant weight to Dr. Brown's opinion.  (Tr. 53.)  With regard to Dr. Kaza's opinion, the decision stated as follows:

> The medical source statements provided by Dr. Kasa [sic], a treating psychiatrist, have been considered but not given great weight. These opinions essentially rate the claimant has having poor ability in all mental activities with the exception of fair ability to understand, remember, and carry out complex job instructions and

22

> to maintain appearance. (Exhibits 16F and 23F). The undersigned notes that during a mental assessment on July 27, 2012, the claimant's appearance was reported as being well groomed. (Exhibit 22F).

(Tr. 53.)

The ALJ found Jenkins suffered from the severe impairments of degenerative disc disease of the lumbar spine with radiculopathy and cervical spine; asthma; mild restrictive and obstructive airway disease; osteoarthritis of the right knee; urge incontinence; depressive disorder; anxiety disorder; and a history of cannabis abuse. (Tr. 49.) The ALJ then adopted the previous RFC, with the additional limitations that Jenkins required a sit/stand option and could never kneel or crawl. (Tr. 51.)

Jenkins first argues the ALJ erred because, although the decision found Jenkins' urge incontinence was a severe impairment, the RFC does not reflect any limitations arising from that condition. (Doc. No. 17 at 17.) Specifically, she maintains that "the ALJ's RFC finding does not reflect the degree to which this severe impairment imposes limitations on Ms. Jenkins' ability to perform basic work activities as required of the regulations and, therefore, does not have the support of substantial evidence." *Id.*

The Court rejects this argument. As noted *supra*, the ALJ fully considered the medical evidence regarding Jenkins' urge incontinence. The decision noted that urodynamic testing had revealed some rotation of Jenkins' bladder neck but showed no signs of obstruction, malignancy, or inadequate pelvic support. (Tr. 54.) The ALJ also noted Jenkins' testimony regarding her urge incontinence, including testimony that she experiences components of stress leakage. (Tr. 53-54, 85, 97-98.) As the Commissioner correctly notes, the RFC does include stress-related limitations, including prohibiting Jenkins from work requiring completion of more than unskilled one to two step instructions; rapid production quotas; or occasional contact with supervisors or coworkers. (Tr. 51.) Moreover, the RFC limits Jenkins to occasional stooping and crouching, which addresses evidence suggesting Jenkins' incontinence is aggravated by bending. (Tr. 394.)

While Jenkins asserts the RFC should have included additional limitations related to this impairment, she fails to identify any such limitations or, more importantly, direct this Court's attention to any treating physician opinion supporting her assertion. In the absence of any

23

medical or opinion evidence suggesting further restrictions were warranted, the Court finds the ALJ did not err in her consideration of Jenkins' urge incontinence.

Jenkins next argues the ALJ failed to include limitations in the RFC that adequately address her worsening degenerative disc disease.  Relying on the July 2012 MRI results and Dr. Ranieri's treatment notes, Jenkins asserts her condition deteriorated to a greater degree than recognized by the ALJ.  She also emphasizes her own testimony that "she has numbness and tingling in her arms and legs that reduces her ability to sit in one place for very long, hold onto things if too heavy, or stand for more than about 10 minutes." (Doc. No. 17 at 18.)  In light of this evidence, Jenkins argues the ALJ "played doctor" when she "arbitrarily added a sit/stand option to her residual functional capacity finding without the support of any medical opinion evidence." *Id.*

As noted above, the ALJ discussed the evidence regarding Jenkins' degenerative disc disease and found it had worsened since the previous decision, noting evidence that "claimant has developed an additional disc bulge with nerve root impairment" and "mild radiculopathy according to recent pain treatment notes." (Tr. 52.)  The ALJ considered the opinions of state agency physicians Dr. McCloud and Dr. Lewis, according them "some weight" but finding "the evidence supports limiting the claimant to a range of light work instead of medium exertional work." (Tr. 53.)  Additionally, although not an "acceptable medical source," the ALJ considered the February 2012 opinion of Jenkins' chiropractor Dr. Grubbs, according it "some weight as it is essentially consistent with" the RFC.  (Tr. 52.)  In light of this evidence, the ALJ added a sit/stand option to the RFC, which is, in fact, consistent with Dr. Grubbs' opinion.  (Tr. 462.) The ALJ did not include any further limitations relating to this impairment, however, in light of Jenkins' conservative treatment history and physical examinations showing 5/5 strength.  (Tr. 52.)

Contrary to Jenkins' argument, the Court finds the ALJ did not "arbitrarily" add a sit/stand option to the RFC.  Indeed, this limitation is expressly set forth in Dr. Grubbs' February 2012 opinion, which is the only medical opinion proffered by Jenkins in support of her claim of disabling limitations relating to her degenerative disc disease.  As with her argument regarding

24

her urge incontinence, Jenkins does not identify any additional functional limitations relating to her degenerative disc disease that she believes should have been included in the RFC or point to any supporting physician opinion.[12]  Here, the ALJ considered the medical and opinion evidence regarding this impairment and provided restrictions relating thereto, including the additional restriction of a sit/stand option.  Jenkins points to no evidence indicating the RFC determination was not supported by substantial evidence with respect to this condition.

The ALJ's consideration of Jenkins' mental impairments, however, presents a more difficult question.  Jenkins argues the ALJ failed to provide good reasons for rejecting Dr. Kaza's April 2012 and September 2012 opinions.  She notes the ALJ only referenced two notes (June 1, 2012 and July 27, 2012) in discussing her treatment with Dr. Kaza and maintains that "[t]he lack of discussion of the evidence in the record along with a one-sentence reason for dismissing Dr. Kaza's opinion (i.e., that Ms. Jenkins appeared well groomed on one occasion) do not rise to the level of 'good reasons.'"  (Doc. No. 17 at 20.)

The Commissioner argues the ALJ did not err because the decision reasonably explained why the evidence failed to show that Jenkins' mental condition had worsened.  In this regard, the Commissioner notes that the previous ALJ considered and rejected Dr. Kaza's July 2009 opinion, which (like his 2012 opinions) concluded that Jenkins "had no abilities to perform any function on a regular, reliable and sustained schedule." (Tr. 119.)  The Commissioner further maintains the RFC is supported by substantial evidence because the ALJ reasonably relied on the opinion of consultative examiner, Dr. Brown.  (Doc. No. 21 at 15-17.)

The Commissioner does not argue Dr. Kaza's treating psychiatrist status.  Moreover, the

---

[12] As the ALJ noted, the RFC is consistent with (or more restrictive than) Dr. Grubbs' opinion in many respects, including Dr. Grubbs' assessments regarding Jenkins' abilities to stand/walk; sit; balance; stoop; crouch; climb; kneel; and, crawl. (Tr. 461-462.)  The RFC is also consistent with Dr. Grubbs' opinion that Jenkins was restricted from heights, moving machinery, temperature extremes, chemicals, dust, noise, and fumes.  *Id.*  Dr. Grubbs' opinion does contain slightly more restrictive lifting/carrying limitations.  *Id.*  It also states that Jenkins would need additional rest periods.  *Id.*  However, Jenkins does not argue that the ALJ erred in failing to include any of Dr. Grubbs' more restrictive findings in the RFC or otherwise challenge the ALJ's assessment of Dr. Grubbs' opinion herein.

25

ALJ decision at issue identifies Dr. Kaza as a treating psychiatrist in its consideration of his 2012 opinions. (Tr. 52.) Thus, and in the absence of any argument to the contrary, the Court determined Dr. Kaza to have been a "treating physician" when he proffered his April and September 2012 opinions.[13]

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[14]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

---

[13] As noted *supra*, the record before the ALJ contains a gap in Jenkins' mental health treatment records. Specifically, the record contains treatment notes from Dr. Kaza from October 2010, December 2010, February 2011, and April 2011. (Tr. 347, 345, 343, 342.) The next document in the record from Dr. Kaza is his April 2012 opinion. (Tr. 410-411.) The parties do not direct this Court's attention to any evidence that Dr. Kaza treated Jenkins between April 2011 and the date he rendered his opinion in April 2012.

[14] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

26

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.*  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

27

Here, the ALJ recounted some of the medical evidence regarding Jenkins' mental impairments and determined that "[m]entally, there is nothing new since the prior decision." (Tr. 52.)  The decision further noted the year-long gap in Jenkins' mental health treatment due to her incarceration; the inconsistent evidence regarding her hallucinations; her conservative course of treatment; and evidence of "some non-compliance." (Tr. 52.)  In declining to include any additional mental health limitations in the RFC, the ALJ discussed the opinion of consultative examiner, Dr. Brown at length and accorded it "significant weight." (Tr. 53, 55-56.)  With regard to Dr. Kaza, the decision briefly summarized his opinions regarding Jenkins' mental health limitations and stated they "ha[d] been considered but not given great weight." (Tr. 52.)  The ALJ's explanation for rejecting Dr. Kaza's opinions is contained in one-sentence as follows: "The undersigned notes that during a mental assessment on July 27, 2012, the claimant's appearance was reported as being well groomed." *Id.*  As Jenkins correctly notes, there is very little discussion of Dr. Kaza's treatment notes in the decision.

As noted above, the Commissioner principally argues that the decision should be affirmed because the ALJ correctly found no deterioration in Jenkins' mental condition since the previous ALJ decision.  Although clearly raised in Jenkins' Brief, the Commissioner does not directly address Jenkins' argument that the ALJ was required to provide "good reasons" for rejecting Dr. Kaza's opinions.  In particular, the Commissioner does not argue that the "treating physician" rule is inapplicable under the circumstances presented.  Nor does she assert that the ALJ did, in fact, provide "good reasons" or that it was "harmless error" for the decision to fail to do so.

In the absence of any argument to the contrary, the Court finds the ALJ was required to provide "good reasons" for rejecting Dr. Kaza's opinions.  The Court further finds that the ALJ's rejection of those opinions fails to satisfy the "good reasons" requirement.  The fact that Jenkins' appearance was once noted as being well groomed is simply not a sufficient reason, in and of itself, for rejecting Dr. Kaza's assessment of Jenkins' numerous functional mental health limitations.  Jenkins presented to Dr. Kaza on at least eleven occasions between June 2010 and February 2013.  (Tr. 342-349, 434-437, 452-455, 459-460, 511.)  During these visits, she consistently complained of increased anxiety, depression, and anger.  *Id.*  The record also

28

contains references to hallucinations, nightmares, flashbacks, panic attacks, and thoughts of hurting others. (Tr. 349, 345, 343, 342, 452, 434.) Aside from the one year gap in her treatment (which was apparently due to her incarceration), Dr. Kaza treated Jenkins on a monthly (sometimes bi-monthly) basis and prescribed numerous psychiatric medications, including Zoloft, Trazadone, Valium, Xanax, Effexor, and Lamictal. (Tr. 342-349, 434-437, 452-455, 459-460, 511.) In August 2012, Dr. Kaza diagnosed PTSD and assigned a GAF of 50. (Tr. 436-437.)

Although the ALJ discusses evidence regarding mental health treatment Jenkins received in June and July 2012, the decision does not discuss Dr. Kaza's lengthy treating relationship with Jenkins or the content of his treatment notes. Indeed, the ALJ does not address any of the factors set forth in 20 C.F.R. § 416.927(c)(2), such as the length of the relationship and frequency of examination; the nature and extent of the treatment relationship; how well-supported Dr. Kaza's opinions are by medical signs and laboratory findings; or, their consistency with the record as a whole. The Court does have some concern that Dr. Kaza's September 2012 opinion is internally inconsistent, in that it concludes Jenkins has a "fair ability" to understand, remember, and carry out complex job instructions but finds she has a "poor" ability in virtually every other category, including her abilities to understand, remember, and carry out detailed and simple job instructions. (Tr. 459-460.) However, the ALJ does not articulate this as a reason for rejecting Dr. Kaza's September 2012 opinion. Indeed, the ALJ fails to offer any "good reasons" as to why Dr. Kaza's opinions were "not given great weight." (Tr. 52.) Moreover, this portion of the decision is so conclusory and devoid of explanation that it deprives this Court of the ability to conduct a meaningful review of the decision. Thus, the Court finds that remand is necessary, thereby affording the ALJ an opportunity to sufficiently explain the weight ascribed to the functional limitations assessed by Dr. Kaza.[15]

---

[15] As the Court is recommending a remand for further proceedings, and in the interests of judicial economy, the Court will not consider Jenkins' arguments that the ALJ erred in relying on the VE's testimony that an individual requiring the use of a cane could perform the positions of mail clerk, sewing machine operator, and small part assembler.

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision is VACATED and the case is REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this opinion.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: May 13, 2015